Mr. Justice Strong
delivered tbe opinion of the court:
These eases have been elaborately and very ably argued, touching both the legality and the construction of the contracts under which the different parties claim. But in the view which we take of the merits of the controversy, it is unnecessary to determine whether the contracts were or were not forbidden by the Non-intercourse Acts of Congress. It is sufficient to examine the contracts themselves, and to determine what is their true meaning.
From the findings of the Court of Claims it appears that the cotton, which is the subject of controversy, was raised upon three plantations in Wilkinson County, Mississippi, worked by John J. Elgee and Josiah Chambers. The interest of the latter, whatever it may have been, was, however, abandoned to his co-partner, and before the seizure, under the Abandoned or captured property Ae^ the whole right of Chambers to the cotton had become vested in Elgee exclusively. This has not been controverted. The fundamental question, therefore, is, in all the cases, whether Elgee parted with the ownership by either of the contracts found by the Court of Claims to have been made by him, or for him by his agent, Gordon. It is the owner alone who has any standing in the Court of Claims under the Abandoned or captured property Act. In regard to such property, only such suits can be .brought as are authorized by the statute. That statute (Act March 12, 1863) furnishes a complete system for the prosecution of claims under it, and defines the extent of the rights which those who claim an interest in the proceeds of property captured or abandoned during the civil war maj-assert against the Government. According to the well-known rules of statutory construction, the system is exclusive of all others, and the rights defined are the only ones which can be enforced in any judicial proceeding. The language of the act is “ that any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims, and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or support to the present rebellion, to receive the residue of such proceeds, after the deduc *197 tion of any purchase-money which may have been paid, together with the expense of transportation and sale’of said property, and other lawful expenses attending the disposition thereof.”
Thus, it is plain that no one is allowed to sue in the Court of Claims for the proceeds of captured or abandoned property unless he can prove to the satisfaction of the court three things: First, his ownership of the property seized; secondly, his right to the proceeds thereof; and, thirdly, that he never gave aid or comfort to the. rebellion. The third, it is true, has been ruled by this court to be no longer necessary since the Amnesty proclamations ; but the ownership of the property at the time of the seizure, and the right to the proceeds thereof, are still indispensable to any standing in court as a claimant for the proceeds of property captured which hare been paid into the Treasury of the United States.
We are, then, to inquire whether Woodruff & Bouchard or Haller Nutt had acquired the ownership of the cotton prior to its seizure by the agent of the United States on the 2d of April, 186-1; for if either of these "parties had become the owner and entitled to the proceeds of its sale before that date, that party is entitled to a judgment for the sum remaining in the Treasury after the deductions are made provided by the statute. If, on the other hand, neither of those parties has shown that Elgee parted with his title; if the ownership remained in Elgee until after the seizure and until his death, his representatives are the only persons who are authorized to sue for the proceeds of the cotton in the Court of Claims, for they only are the owners, whatever equities may exist in favor of the parties who contracted to buy.
We come, then, at once to the question whether Woodruff' & Bouchard acquired the ownership of Elgee. If they did, it was mediately through C. S. Lobdell. They made no contract with Elgee, but Lobdell did, and they purchased Lobdell’s contract. What, then, was that contract ?
On the 31st day of July, 1863, W. C. Gordon, an. authorized agent of Elgee & Chambers, entered into the following agreement with Lobdell:
“Mississippi; WiUcinson County.
“ We have, this 31st of July, 1863, sold unto Mr. C. S. Lob-dell our crops of cotton now lying in the county aforesaid, *198 numbering about 2,100 bales, at the price of 10 cents per pound, currency; the said cotton to be delivered at the landing at Fort Adams, and to be paid for when weighed, Mr. Lobdell agreeing to furnish at his cost the bagging, rope, and twine to bale the cotton unginned; and we do acknowledge to have 'received, in order to confirm this contract, the sum of $30. This cotton will be received and shipped by the house of Da Silva & Go., New Orleans, and from this date is at the risk of Mr. Lobdell. This cotton is said to have weighed an average of five hundred pounds when baled.
“W..O. GOEDON,

“Agent for Messrs. JElgee & Chambers.

“C. S. LOBDELL.”
At the time when the contract was made, the baled cotton was stored under a covering of boards at some place not certainly designated. A portion equal to about twenty bales unbaled was in a gin-house on Buffalo Bayou, at a place known as “The Books,” or “Felter7s Plantation,” about ten miles from the Mississippi Eiver. At this latter place Lobdell and the agent of Elgee met. Whether it was the same place where the bulk of the cotton was lying does not distinctly appear. Immediately after the contract, Lobdell employed J. M. Morris, living near where the cotton was stored, “to watch and take care” of it, .and paid him therefor, and Morris continued his care until the cotton was seized by the agent of the United States. But it does not appear that the possession was surrendered to Morris, or that there was any change of possession. At this time the region where the parties were was greatly disturbed by the war, and the cotton was in danger of being burned by the confederate forces and of being captured by the United States. Under these circumstances, what ought it to be concluded was intended by the contract between Gordon and Lob-dell ? Was it intended to pass the property in the cotton to the purchaser, or was it in legal effect only an agreement to sell?
It must be admitted there is often great difficulty in determining whether a contract is itself a sale of personal property, so as to pass the ownership to the vendee, or whether it is a sale on condition, to take effect or be consummated only when the condition shall be performed, or whether it is a mere agree *199 ment to sell. It is doubtless true that whether the property passes or not is dependent upon the intention of the parties to the contract, and that intention must be gathered from the language of the instrument. There are, however, certain rules for the construction of such contracts, which are well settled in England, and we think also in this country. Mr. Justice Blackburn, in his work on Sales, pages 151,152, states two of them, and Mr. Benjamin, in his treatise, 2d edition, page 236, adds a third. They are as follows:
First. “When by the agreement the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is bound to accept them, or, as it is sometimes worded, into a deliverable state, the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition-precedent to the vesting of the property.”
Second. “Where anything remains to be done to the goods for the purpose of ascertaining the price, as by weighing, measuring, or testing the goods, where the price is to depend on the quantity or the quality of the goods, the performance of these things shall also be a condition-precedent to the transfer of the property, although the individual goods be ascertained and they are in the state in which they ought to be accepted.”
Third. “ Where the buyer is by the contract bound to do anything as a consideration, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer.”
These may be regarded as rules for ascertaining the intention of the parties. They are in most cases held to be conclusive tests. Though not supported by all the decisions, they certainly are generally accepted in England and by most of the courts of this country. And they are the rules which are applicable to contracts for the sale of specific chattels, contracts ■which define the articles which are the subjects of agreement, either single articles or aggregates separated from others, as the grain in a bin, the hides in a specified, vat, &e., or such a case as the present, all the cotton at a designated pilace. A considerable number of the numerous authorities which justify these rules are collected by Mr. Benjamin in his Treatise on *200 Sales, 2d edition, pages 234, et- seq. Applying them to tbe contract now under consideration, we think that it cannot be maintained that the parties intended the contract should pass the ownership of the cotton at once to the buyer, without any ascertainment of the whole price by weighing, without its complete preparation for delivery, without any delivery, and without payment. This is not the case of an unconditional sale of a specific chattel for an ascertained price. Its subject was the crops of cotton then lying in Wilkinson County. The contract was a cash contract. No credit was intended. An ascertainment of the price by weighing was contemplated, though it is not stated where the weighing should be done. The vendor undertook to deliver at Fort Adams. He was to deliver it in bales. Yet all the property was not in a deliverable state. Part was unginned, unbaled, and unbagged. The vendor was to prepare it for delivery by ginning, baling, and bagging it, and Lobdell was to furnish the necessary bagging, rope, and twine. This was to put the cotton into the condition in which he was bound to receive it, for he was not bound to receive any unless the whole was ginned, baled, and bagged. The contract was entire$ and the vendor was not bound to put the cotton into a deliverable state unless Lobdell furnished the necessary materials. Besides, it was stipulated that the cotton should be received by Da Silva & Co.
Our conclusion does not rest merely on the ground that the cotton was not weighed or delivered. It is unnecessary to decide that weighing the cotton was in this case a prerequisite to the transmission of the property, though that appears to be the law in England, when by the contract the goods are to be weighed by the vendor or by him concurrently with the ven-dee. In the leading case of Hanson v. Myer, (6 East, 114,) where it appeared that under a contract of sale a vendee agreed to purchase all the starch of the vendor, then lying at the warehouse of a third person, at so much per hundred-weight, by bill at two months, and the starch was in papers, but the exact weight was not then ascertained, and was to be ascertained afterwards, and fourteen days were to be allowed for the delivery, and where the vendor gave a note to the vendee, addressed to the warehouse-keeper, directing him to weigh and deliver to the vendee all his starch, it was decided that the absolute property in the starch did not pass to the vendee before the *201 weighing, which was to precede the delivery and to ascertain the price; and this though a part had been weighed and delivered, and though a credit was given. Nothing was wanting to specify the subject of the contract. It was all the vendor’s starch in the warehouse. So in Simmons v. Swift, (5 B. & C., 857,) where the contract was, “ I have this day sold the bark stacked at Bedbrook, at £9 os. per ton of twenty-one hundred-weight, to Hezekiah Swift, which he agrees to take and pay for on the 30th of November, October 23d,” and some of the bark was weighed and delivered, it was held that the property in the residue did not vest in the purchaser until it had been weighed. In Logan v. Le Mesurier (6 Moo. P. C. C., 116) the sale was by the following contract; “Hart, Logan & Co., of Montreal, sell, and Le Mesurier, Bouth & Co., of the same place, buy, a quantity of red-pine timber, the property of Thomas Durell, of Hull, L. C., but under the control of the sellers, now lying above the rapids, near the Chaudiere Falls, Ottawa Biver, and stated by the said Thomas Durell to consist of 1,391 pieces, measuring 50,000 feet, more or less, deliverable at Quebec on or before .the 15th of June nest, and payable by the purchasers’ promissory notes, at ninety days from this date, at the rate of 9-3rd. per foot, measured off. Should the quantity turn out more than above stated, the surplus to be paid for by the purchaser at 9per.foot on delivery; and should it fall short, the difference to be refunded by the sellers.” It was held that by the terms of the contract the sale was not complete until the measurement and delivery of the timber was made, and that the transfer of the property was postponed until the measurement at the deliverj-. Here the timber was fully specified by the description and by the place where it lay. A statement of the estimated quantity was given; the time and place of delivery were designated, as was the price per foot, measured off. Credit was also stipulated for. It was the case of selling ascertained chattels for an ascertainable sum. If this stood alone, the contract would have passed the property, but it was controlled by the provisions for the possession, carriage, and delivery, as well as the measurement and readjustment of the price. Many other English cases to the same effect might be cited. (See Lagury v. Furnell, 2 Camp., 240; Rugg v. Minett, 11 East, 210; Gilmour v. Supple, 11 Privy Council, 551.) We do not understand that there is any disposition to depart from *202 the doctrine of these cases or,that of Mr. Blackburn’s first and second rules. Of course, when nothing remains for the seller to do, when the weighing or measurement stipulated for is incumbent upon the buyer, or when the parties have provisionally agreed that a certain sum shall be taken for the price, subject to future correction, the contract is not within the rules. Turley v. Bates (2 H. & C., 200) has sometimes been thought a departure from the earlier cases, but we think without reason. It was the case of the sale of an entire heap of fire-clay' at 2s. per ton. The buyer was to cart it away and weigh it. He weighed, removed, and paid for a part, and refused the rest. It was held the property of the whole heap had passed to him. But here the seller had nothing to do with the weighing or delivery. He had performed all he was required to do, either for ascertaining the quantity or the price. Besides, the jury had found as a fact that the sale was of the whole heap. The case of Kershard v. Ogden (3 H. & C.r 717) is in substance the same. In each of these eases the contract was in parol, and, what it was, necessarily, for a jury.
It is true there are some American decisions, especially in New York, that are not in entire harmony with those we have cited. There are at least some dicta in Crofoot v. Bennett (2 Comst., 258) tending to show that specification of the subject in a contract for sale is sufficient to pass the property, though the vendor has the ¡duty still of ascertaining the entire price by weighing or measuring before delivery. And in Kimberly v. Patchin, (19 N. Y., 330,) and Russell v. Carrington, (42 N. Y., 118,),it seems to have been ruled that the sale of a specified quantity of grain, part of a larger bulk, with a receipted bill of sale and an order for the grain, passed the title, without any actual separation or delivery of the property. These decisions, we think, are not in accordance with the authorities generally in this country. They are in conflict with later decisions in New York. In Kein v. Tupper (52 N. Y., 553) the English rule was strictly accepted. There it was said by Chief-Justice Church that, when anything remains to be done by the vendor to ascertain the identity, quantity, or quality of the property, no title passes. That was the case of a sale of a certain number of bales of cotton, described by marks, at so much per pound •, and the court said, as the cotton was to be weighed by the vendors to ascertain the quantity, and sampled by both parties to ascertain the quality, no title passed until these acts were done. *203 We do not care, however, to review the decisions on this subject further, for the stipulation in the contract now under consideration, that the cotton should be paid for when weighed, was only one of several provisions tending to the conclusion that the intention of the parties was not to effect an immediate passing of the property.
We have already noticed that no sale upon credit was intended. There was, therefore, no reason why the vendor should part with anything before the purchase-money was paid or tendered. The possession was certainly retained. The vendors undertook to deliver at Fort Adams. To enable them to carry and thus deliver, possession was indispensable. The contract also provided that the cotton should be received by Da Silva & Co. This agreement to carry and deliver at Fort Adams, on the Mississippi, where it was obviously intended the contract should be consummated by the receipt of the cotton and the payment of its price, concurs with other circumstances in indicating a purpose of the parties that the property was not intended to be changed until the weighing, delivery, receipt, and payment took place. So it was regarded in Logcm v. Le Mesurier, (supra.) Indeed, assuming, as the contract warrants, that the sellers were to carry the cotton to a designated place, and to ascertain its quantity and aggregate price by weight before delivery, and assuming that it was then to be received, and that payment for the whole was to be concurrent with the delivery, it is hard to find any intention that the owners intended to part with their ownership while the cotton lay at Felter’s plantation.
Added to this is, we think, a very significant circumstance. The contract shows that a portion of the cotton was not in a condition for delivery. True, it was relatively but a small portion, sufficient, as found by the court, to make about twenty bales. But, as we have noticed, the contract was entire. It was for all the crops. . The purchaser was under no obligation to take less than the whole. The subject of the contract was baled cotton, and Lobdell bargained for that. Nothing in the contract, indeed, shows clearly how much of the cotton was unginned, and how much was unbaled, but it reveals that a portion was, and certain it is it was considered essential that all which had not been ginned and baled and bagged should be put into that condition before the vendee was required to accept it. And this the sellers were required to do. So much *204 is clearly implied in the contract. If, then, it be, as asserted in Mr. Blackburn’s first rule, that when anything remains-to be done by the seller for the purpose of putting the goods into that state in which the purchaser is bound to accept them, or, in other words, into a deliverable condition, the property does not pass,.it cannot be held that there was any intention of Gordon or his principals to transmit to Lobdell the ownership of the cotton before its delivery and before the payment of its stipulated price. We do not deny that a person may buy chattels, in an unfinished condition and acquire the right of property in them, though possession be retained by the vendor, in order that he may fit them for delivery. But in such a case the intention to pass the ownership by the contract cannot be left in doubt. The presumption is against such an intention.
It should also be noticed that Lobdell undertook by the contract to furnish the necessary bagging, rope, and twine to put the unginned and unbalod cotton in a deliverable state. Obviously this was to be done before the sellers were bound to deliver. It was, therefore, a condition-precedent, upon which the vendee’s right depended. With this condition there Was no compliance, and thus neither the vendors nor the vendee did all that it was contemplated and agreed they should do preparatory to the acceptance of the goods, or to bring the cotton to the condition in which it was understood it should be to entitle the sellers to the price stipulated.
On the other side it has been argued with much earnestness that the provision in the contract, that the cotton, from the date thereof, should be at the risk of Lobdell, exhibits an intention of the parties that the property should pass. It must be admitted that when a contract of sale has transmitted the property in its subject to the buyer, the law determines, in the absence- of agreement to the contrary, that the risk of loss belongs to him. This is a consequence of his ownership, though undoubtedly the property may be in one and the risk in another. But it needs no agreement that the buyer shall take the risk, if it is intended the ownership shall pass to him. Hence the stipulation that the cotton should be at the risk of Lobdell after the date of the contract, instead of showing an intention of the parties that the right of property should pass to him, seems rather to indicate a purpose that the ownership should remain unchanged. Else why introduce a provision totally unnecessary % Such was the inference drawn from the introduc- *205 tiou of a similar clause in a contract considered in Martineau v. Kitching, (7 Law Rep. Q. B., 436.) There it was stipulated that the goods should remain at the risk of the sellers ; and Lord Cockburn asked, “If the property in the goods had not passed to the'buyers, why was it said the goods should remain at the risk of the sellers?” adding further, “ What would be the necessity, what would be the object and purpose of such a stipulation if the property still remained in them ? Of course it would be at their risk.” It may be asked, what then was the object of stipulating that the cotton should be at Lobdell’s risk if it was not intended to evidence a transmission of the title? No doubt some purpose existed, and we think it may be found in the circumstances in which the parties stood when they contracted. The cotton was in a disturbed region of the couutry. It was in danger of destruction by the confederate forces and of capture by the United States forces. The sellers undertook to carry and deliver it at the landing at Fort Adams. Such a delivery might be rendered impossible by the vicissitudes of the war, and hence it was a reasonable provision that Lobdell should bear the risk ; that the sellers should not be answerable in damages in case of confederate burning or Federal capture. To us this is a sufficient explanation of the assumption of the risk by Lobdell, without regarding it as a mutual recognition of a change of ownership.
It is hardly necessary to add that the receipt of 830, “ in ¡I order to confirm the contract,” can have no bearing upon the» question whether the property passed. The confirmation of the ( contract and its effect are distinct matters. Whatever may have been thought by some old writers respecting the effect, in the transmission of property, of giving and receiving earnest-money, it is now considered of no importance or of the smallest importance. The subject is discussed in Benjamin on Sales, 2d | edition; pages 2G0-262, and the conclusion is reached that the) true legal effect of earnest is simply to afford conclusive evi-f dence that a bargain has been actually completed, with mutual , intention that it should be binding on both; and that the inquiry i whether the property has passed in such cases is to be tested, ¡ not by the fact that earnest is given, but by the true nature of 1 the contract concluded by giving the earnest. The author says , further, “No case has been found in the books in which the giv-! ing of earnest has been held to pass the property in the subject- ¡ matter of the sale, where the completed bargain, if proved in! *206 writing or in any other sufficient manner, would not equally have altered the property.”
In our judgment, therefore, the contract of July 31, 1863, must be regarded as only an agreement to sell, and not as effecting a transfer of the ownership. It left the property in Elgee, where it was before.
We are the better satisfied with this conclusion because it works substantial justice, and because it accords with what appears to have been the subsequent understanding of the parties. The bargain was for cash, yet no steps were taken to consummate it until after the cotton was seized in April, 1S64. Never, indeed. No tender of the price was made ; the cotton was neither weighed, delivered, nor received; and throughout both parties appear to have treated the agreement as merely executory.
The result of what we have said is that neither Lobdell iior Woodruff & Bouchard, who claim under him, had any such ownership of the cotton as to entitle them or either of them to sue in the Court of Claims for its proceeds.
We come next to the claim of Mrs. Nutt, executrix of Haller Nutt, deceased. A very vigorous argument has been made to us in support of this claim, but we think it cannot be sustained. Assuming that Nutt’s contract with Elgee, made in October, 1863, was not illegal, that it was not in violation of the non-intercourse laws, it still was not such a contract as passed the property in the cotton. The finding of the court is that in October, 1863, Truman Holmes, as the agent of Dr. Nutt, contracted with Elgee for the sale from him of so much of the 2,100 bales of cotton stowed at Felter’s plantation as he (Holmes) should get out in safety to a market, for the price £16 per bale, to be paid in Liverpool, the risk of the cotton till got out to be on Mr. Elgee. That this was but an executory contract is very plain. Its subject was indefinite. It was not necessarily the 2,100 bales; not certainly any of them. It was simply so much of them as Holmes should get out in safety to a market. The agreement contemplated that he might never get out any. If so, nothing was agreed to be sold. In fact he never did get out a bale. Whatever else may be dispensed with, it is certain that there can be no sale of personal chattels without a specific identification of the thing sold. Which of the whole number of bales could the purchaser say was his ¶ For which of them could he have been compelled to pay ? And there is no evidence that *207 Holmes ever received the cotton or any part of it, or asserted any possession, though, the sale was on credit; and if the property was his principal’s, he was entitled to remove it at once to a market.
Our attention has been called to the letter addressed by Elgee to Holmes afterwards, which it is argued was itself a sale. It was dated October 8, 1863, and was as follows:
“Dear Sir : It having been agreed on between you and myself that I sell to you all the cotton-of Elgee and Chambers now baled and under shed, for the price of fifteen pounds sterling per bale, payable in Liverpool, you will cause the same to be placed to my credit with James A. Jackson & Co., of Liverpool.
“ J. K. ELGEE.
“Capt. Truman Holmes, Present.”
This was not found by the court to have been the contract between the parties. It refers to the former agreement, and evidently it was intended as a direction where to pay the price of the cotton, if any should be got out, and if any purchase-money should become due. It had no other purpose. It was not even a delivery order. Much less can it be regarded as a bill of sale. And there is no finding that it was accepted. The only contract, therefore, respecting the sale of the cotton to Holmes, upon which the executrix of Dr. Nutt can rely, is that found by the court to have been made — a contract for the sale of so much of the 2,100 bales as Holmes should get out in safety to a market, and that contract passed no property in the cotton.
This disposes of the whole case. The property in the cotton was in Elgee, and neither of the contracts proved divested him of his ownership. The result is that his personal representatives are entitled to a judgment for the entire proceeds of the cotton held in trust for the owner.
The judgment of the Court of Claims is reversed, and the record is remitted, with instructions to dismiss the petition of Woodruff & Bouchard, and Julia A. Nutt, executrix, and to-enter a judgment, in favor of the personal representatives of John K. Elgee, for the sum found in the Treasury, the net proceeds of the sale of the cotton.
Bradley and Hint, JJ., dissented.